## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 18 2020, 10:53 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT AF

Justin R. Wall
Wall Legal Services
Huntington, Indiana

ATTORNEY FOR APPELLANT DF

Daniel J. Vanderpool
Vanderpool Law Firm, PC
Warsaw, Indiana

ATTORNEY FOR APPELLEE

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Termination of the Parent-Child Relationship of: D.F., S.F., and J.F. (minor children) and A.F. (Mother) and D.F., Sr. (Father) | May 18, 2020 |
| | Court of Appeals Case No. 19A-JT-2837 |
| A.F. (Mother) and D.F., Sr. (Father), | Appeal from the Wabash Circuit Court |
| *Appellants-Respondents,* | The Honorable Robert R. McCallen III, Judge |
| v. | Trial Court Cause No. 85C01-1904-JT-006 85C01-1904-JT-007 85C01-1904-JT-008 |
| Indiana Department of Child Services, | |
| *Appellee-Petitioner* | |

**Vaidik, Judge.**

# Case Summary

[1] D.F., Sr. ("Father") and A.F. ("Mother") (collectively, "Parents") appeal the termination of their parental rights to their three children. We affirm.

# Facts and Procedural History

[2] The facts that follow are taken primarily from the trial court's findings of fact, none of which Parents challenge on appeal.[1] Parents are the biological parents of three children: D.F., born in 2006; S.F., born in 2007; and J.F., born in 2009 (collectively, "Children"). In July 2013, the Wabash County Sheriff's Department responded to a domestic-violence call at Parents' house. When officers arrived, they discovered that Father had hit Mother in the back of her head with a "Mag light." Father's App. Vol. II p. 52; *see also* Tr. p. 23. Father had left the scene. Mother had a "significant injury to the back of her head" and was transported to a nearby hospital. Tr. p. 23. Because Children were present and witnessed the incident, the Department of Child Services (DCS) was called. When Family Case Manager (FCM) Valerie Eiler arrived, she went inside Parents' house and found that the home conditions were "deplorable." Father's App. Vol. II p. 52. The basement was filled with "standing water and sewage,"

---

[1] Because neither Father nor Mother challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

and there were dirty dishes, piles of clothes, and animal feces throughout the house. Tr. p. 23. Father was later located "hiding in a house" and was arrested and charged with Class D felony domestic battery. Father's App. Vol. II p. 52. He would remain in custody until early 2014.[2] Children were removed from Parents' care and placed together in foster care. Shortly after, DCS filed petitions alleging that Children were in need of services (CHINS).[3]

[3] In October 2013, the trial court found that Children were CHINS and ordered that Children continue to be detained. Following a dispositional hearing in November, the court ordered that Parents participate in services, including home-based case work services, parenting assessments, psychological assessments, substance-abuse assessments, and supervised visitation. At the time, Father was still incarcerated and was ordered to begin services as soon as he was released. The trial court also authorized a trial home visit with Mother, which began in December 2013.

[4] In January 2014, the trial court held a review hearing and found that Mother was complying with Children's case plan and that Father had recently been released from incarceration but had not yet begun services.

---

[2] In January 2014, the State dismissed the case against Father. *See* Father's App. Vol. IV p. 49.

[3] DCS had contact with Parents before July 2013. The outcome was that a guardianship over D.F. and S.F. was granted 2008. Despite this guardianship, Children were in Parents' care in July 2013.

[5] A month later, law-enforcement officers were called to Parents' house on a report that Mother was threatening to harm Father. When officers arrived, Father refused to speak with them "other than to say 'F**k you,'" and Mother was found locked in a bathroom with J.F. Father's App. Vol. III p. 56. Mother yelled at the officers to "get the f**k out of my house," and when they tried to open the door to get J.F. out, Mother screamed that "she was going to stab herself if law enforcement came in." *Id*. Eventually, officers were able to force their way in, and Mother grabbed "a large butcher knife and pointed it downwards stating she would stab herself." *Id*. Officers ordered Mother to drop the knife, and when she refused, they tased her. *See id.* Mother was arrested and charged with Class A misdemeanor resisting law enforcement, Class A misdemeanor intimidation, and Class B misdemeanor disorderly conduct. She later pled guilty to Class A misdemeanor resisting law enforcement and was sentenced to one year, which was suspended to probation. Children were again removed from Parents' care and placed together in foster care. The next day, the court held a detention hearing and ordered that Children continue to be removed from Parents' care.

[6] In May 2014, the court modified the dispositional decree and ordered that Parents participate in additional services, including submitting to random drug screens and participating in the "Alternative Batterers Program" and "therapeutic Supervised Visitation." *Id.* at 64.

[7] By December, Parents were consistently engaging in services and asked the court to change the case to "an In-home CHINS." *Id.* at 71. The trial court

found that "progress ha[d] occurred" but not sufficient enough "to jump from the beginning of community visits, to In-home CHINS, at this time." *Id.* The court did find, however, that Parents could have an extended visit with Children over the Christmas holiday.

[8] At the February 2015 CHINS review hearing, the court found that Parents had stopped complying with Children's case plan and that neither was cooperating with DCS. *See id.* at 73. The court ordered that Mother's current substance-abuse treatment be reevaluated and that Father complete a new substance-abuse assessment "to determine the need for services." *Id.* at 74. Children's placement outside Parents' home was also continued. In May, Father filed a petition for dissolution of marriage. At a July permanency hearing (which Parents failed to appear for), the court found that Parents were only partially complying with Children's case plan and ordered that Children's permanency plan be changed to a concurrent plan of reunification and termination. The court also appointed a Court-Appointed Special Advocate (CASA) for Children around that same time.

[9] Parents failed to appear for a January 2016 CHINS review hearing. The court found that Parents were not in compliance with Children's case plan and were not cooperating with DCS. Parents also had not been visiting Children. *Id.* at 84. By August, however, Parents re-engaged in supervised visitation. In late October 2016, Mother was granted another trial home visit with Children.

[10]     Three days into the second trial home visit, Children were removed from Parents' care for the third time. They were placed together in foster care. Father had just been released from jail and returned to Parents' house. Law enforcement was called when Father became intoxicated and began arguing with Mother in front of Children. Father was arrested and later charged with Level 6 felony domestic battery and Class A misdemeanor intimidation. He later entered into an agreement with the State to plead guilty to Level 6 felony intimidation and was sentenced to two years, with one year to be served in either the Department of Correction or local jail and the other year suspended to probation. After Children were removed, the court held another detention hearing and ordered their continued placement outside Parents' home. *Id.* at 91. In its order, the court noted that Mother had "attempted to prevent her son [D.F.] from seeking help relating to the domestic violence incident by hanging up on a 911 operator and instructing him not to speak to law enforcement officers." *Id.* at 92.

[11]     In late 2016, Father posted bail and was released from custody. After his release, he did not contact DCS or reengage in services. Instead, Father went to Georgia.

[12]     In January 2017, following a CHINS review hearing, the court found that Parents had "partially complied with [Children's] case plan" and "have been inconsistent with services and have not benefitted from the services to a point where reunification would be safe." *Id*. at 94. Parents' divorce was finalized in February. *See* Tr. Vol. III p. 170.

[13]     In March, DCS filed petitions to terminate Parents' parental rights to Children. Then, in May, based on the recommendation of Children's therapist, the court modified the CHINS dispositional decree so that family therapy could begin "as soon as possible." Father's App. Vol. III p. 99. After a permanency hearing in July, the court found that family therapy occurred five times but that the family was not engaged. Specifically, the court found that Mother "was cooperative in attending the sessions, however, the family as a whole ha[d] little to no insight about how the trauma has impacted them." *Id.* at 104. Regarding Father (who did not appear for the hearing), the court found that he was not in compliance with Children's case plan, was "residing out of state," and was "not participating in any services or in person visitation." *Id.* The court ordered that Children's permanency plan be that "of adoption with a concurrent plan of reunification." *Id.* at 105.

[14]     In November 2017, Mother filed a motion to modify the dispositional order. Following a hearing on Mother's motion, the court found that "Father is no longer a part of [Mother's] life and she is attempting to go it alone, albeit with some financial assistance from him." *Id.* at 108. Although the court found that "[w]hile not necessarily apparent, progress, at least on a personal level for [M]other, has occurred," it denied her motion to modify the dispositional order. *Id.*

[15]     At the January 2018 CHINS review hearing, the court found that Mother was in partial compliance with supervised visitation, random drug screens, and family therapy, and ordered her to participate in the "Seeking Safety and

Batterers Intervention Program." *Id.* at 111. As for Father, the court found that he "ha[d] not participated in any services since moving to Georgia in November 2016." *Id.* at 110.

[16] The trial court held a fact-finding hearing on DCS's termination petitions over three days in February and March 2018. Father did not appear, and the court found that "[h]e has been and remains in Georgia, choosing to appear only by counsel." Father's App. Vol. II p. 50. Following the hearing, the court denied DCS's petitions to terminate Parents' parental rights to Children. The trial court explained:

> While the Court could easily have made a different determination as to [Father] only, terminating his obligation to pay support would not be in [Children's] best interests. Of course, should [Mother] and [Father] renege on their promises to go it alone, the Court will very likely to re-visit the issue of termination of parental rights.
>
> At first blush, it may appear absurd that after such a long removal, the parent's rights are not terminated. However, many different factors attributed to the long removal, including changes in foster placements and service providers, DCS personnel, the behaviors of [Mother] and [Father] and the lack of evidence. The Court must make its determination based upon the evidence presented in Court. The evidence fell short of supporting termination. In that regard, [Mother] should count her lucky stars that she is being given what is very likely one last chance to step up to the plate and be the parent she needs to be, including doing whatever it takes to do so. Her recent behavior offers a glimmer of hope. That glimmer can be quickly tarnished if she falls back into her old ways. That would be a terrible tragedy for her children who deserve much better.

*Id.* at 54.

[17] At a CHINS permanency hearing in July, the court found that Mother was in compliance with Children's case plan. The court further found that she was "participating in all required services on a consistent basis" and had "consistently [drug] screened as requested with no positive screens." Father's App. Vol. III p. 115. In August, Father was extradited to Indiana from Georgia on warrants out of Wabash and Howard counties. *See* Tr. pp. 51-52.

[18] In December 2018, DCS filed a "Motion for Approval of Trial Home Visit" for all three children in Mother's home. Father's App. Vol. II p. 117. The court found that Mother had made progress in services and "appeared to engage meaningfully to remedy the reason for out of home placement." *Id.* The court also found that while D.F. and J.F. wished to return to Mother's home, S.F. "is adamant that she does not wish to return to [Mother's] home or visit in-home on Christmas." *Id.* The court ordered that D.F. and J.F. participate in a trial home visit with Mother and that S.F. participate in a four-hour in-home visit on Christmas. *See id.*

[19] Father, who by then had been in and out of jail since August 2018, was placed on work release in early 2019. In February, DCS filed a motion to terminate Mother's trial home visit. DCS alleged that there was recently an incident where Parents were found extremely intoxicated at Mother's house. Mother had "neglected to pick up [D.F. and J.F.] from school and did not know their whereabouts, and [D.F. and J.F.] witnessed yet another incident of violence

involving one of their parents when [Father] was forcibly restrained by law enforcement to prevent an attack on a case manager." Mother's App. Vol. III p. 220. Father was charged with Level 6 felony resisting law enforcement, Class A misdemeanor intimidation, and Class B misdemeanor disorderly conduct. He was incarcerated from February 2019 to March 2019 and again from May 2019 to October 2019. He later pled guilty to Level 6 felony resisting law enforcement and Class A misdemeanor intimidation and was sentenced to two-and-a-half years in the DOC. The trial court granted DCS's motion to terminate the trial home visit, and D.F. and J.F. were once again removed from Mother's care. *See id.* at 225. They were placed together in the same foster home as their sister, S.F. At the April 2019 CHINS permanency hearing, the trial court changed Children's permanency plan to termination. Later that month, DCS filed new petitions to terminate Parents' parental rights to Children.

[20] In May, the court held the initial hearing on the termination petitions. Father, who was incarcerated at the time, refused to appear for the hearing, telling officers at the jail "that he was not going to court th[at] morning." Tr. Vol. II p. 5. His attorney appeared on his behalf and participated in the hearing. Following the initial hearing, the court set the fact-finding hearing to begin on June 28. Mother filed a motion for a change of judge on June 26. At the beginning of the fact-finding hearing, the court addressed Mother's motion. Mother, through counsel, admitted that her motion was not timely for an automatic change of judge but alleged that "given the history, and the length of time we've gone through this case, and the prior termination cases, and some of

the comments, um, about that prior termination hearing, that, perhaps, the Court has, um, some preconceived notions about the outcome of the current termination proceedings." *Id.* at 18. Father joined Mother's motion and explained that "the fact that the Court has given chances, uh, probably above and beyond what would normally be done, uh, and – and I think expressed some understandable frustration. But going forward, I think we want to make sure that that's not going to be something that would color the proceedings." *Id.* at 19. The trial court denied Mother's motion for a change of judge and stated, "I think I can be fair and impartial. I think I have tried to do that. I think I'll stick with what the facts are in that particular case." *Id.* at 20. The trial court then started the termination fact-finding hearing, and FCM Gary Spratt testified regarding the conditions that led to Children's initial removal from Parents' care. After a few minutes, the trial court concluded the hearing, stating "we will resume the testimony due to inadequate time [on] October 29th, 30th, and 31st." *Id.* at 24.

[21] Less than two weeks before the termination fact-finding hearing was set to resume on October 29, Father filed several pro se motions, even though he was still represented by counsel. On October 17, Father filed a "Motion for Appearance," stating that he "files his appearance" in the case. Father's App. Vol. II p. 75. On October 18, he filed a motion for continuance and a "Motion to Raise Issues At Trial Level for Appeal." *Id.* at 77, 79. Three days later, he filed two more motions: a second motion for a continuance and a motion to proceed in forma pauperis. *Id.* at 82, 85. The next day, Father filed four more

motions: (1) a third motion for a continuance, (2) a request for production, (3) another "Motion to Raise Issues At Trial Level for Appeal," and (4) a "Request For Bonding Assessment." *Id.* at 88, 90, 92, 95. That same day, October 22, Father's attorney since 2015 filed a motion to withdraw his appearance, stating he was doing so "at the instruction of the Natural Father." *Id.* at 98. The next day, the trial court granted Father's attorney's motion to withdraw. On October 24, Father filed a request "seeking the assistance of second chair." *Id.* at 100.

[22] On October 25, the court held a hearing on Father's various motions. During the hearing, the court confirmed that Father wished to represent himself and was only "seeking a second chair." Tr. Vol. II p. 28. Father confirmed that is what he wanted, and the trial court appointed "second chair." *Id.* at 30. The trial court commented, "I doubt very much that person is going to be able to attend given your last minute requests. They have busy lives and schedules as well. I'm going to appoint Attorney Sharon Breitenbach. . . . Whether she can meet with you, assist you, I do not know." *Id.* at 31. The court then moved on to Father's request for production, and DCS provided Father a copy of the documents he requested (which had previously been provided to his former attorney) in open court. *See id.* at 29-30. Then, the court stated that it was taking judicial notice of the first termination proceeding and stated:

> In that proceeding, I did deny termination. I indicated I'd have no problem terminating your parental rights based upon the evidence and history, um, and your apparent acquiescence to that. But I did not because I decided based upon the evidence presented, at that time, not to terminat[e] [Mother's] rights.

As my order indicated, you were, at least for a period of time, a source of income for [Mother] and [Children]. And given [Mother's] work history, I believed terminating your rights would deprive her of a financial support that she would need going forward.

Your recent termination of your attorney, your pro se appearance, your request for production of documents, and all other pro se filing herein, in my opinion are merely an attempt to underly [sic] and delay these court proceedings in what I think you believe is going to somehow aid [Mother]. I'm not going to allow that. Your children deserve better. You should be ashamed of yourself.

******

Given my prior position not to terminate your rights, if I don't terminate her rights, you're adequately represented by [Mother's attorney], who is not your attorney of record. But the issues she will preserve and raise would benefit you as well.

Tr. Vol. II pp. 30-31. The court then denied Father's remaining motions, including his three motions to continue, finding "them a sham on the Court." *Id.* at 31. The court closed the hearing by confirming that the termination hearing would resume, as scheduled, on October 29 and commenting to Father, "these children deserve the attention and the life they ar[e] entitled to. They've certainly not been getting it in the last several years. You've actually played zero role." *Id.* at 34.

[23] On October 28, the day before the termination hearing was set to resume, Father filed a motion for change of judge, asking the judge to recuse himself

because he had been involved in the prior termination case and made comments about what happened in that case during the October 25 hearing. *See* Father's App. Vol. II pp. 105-112. Later that same day, the trial court denied Father's motion for a change of judge.

[24] On October 29, the termination hearing resumed. At the start of the hearing, Father and his attorney objected to the hearing, alleging that they did not have enough time to prepare. Tr. Vol. II pp. 41, 43. The court denied any continuance, stating, "there's been adequate time, [Father] just made a conscious decision to terminate his attorney, conveniently right . . . on the eve of trial." *Id.* at 41, 43. The trial court also noted that the dates for the termination hearing had been set since May 2019. *See id.* at 43.

[25] Therapist Annette Dubois testified that she worked with D.F. to address his anxiety issues and obsessive-compulsive disorder. Therapist Dubois testified that D.F. needs a home that provides structure, understanding, patience, "no surprises," and stability. *Id.* at 63. Therapist Terri Valentine testified that she worked with S.F. on her belief that she had "to parent her younger brother and sister" and to address her lack of trusting adults. *Id.* at 79-80. Therapist Valentine said that S.F. needs a home that provides her "challenge, enrichment, and opportunities to learn, opportunities to be in the community and be involved." *Id.* at 81. Therapist Valentine stated that S.F. had expressed to her that she does not want to live with Parents and does not "want to have a close relationship" with them. *Id.* at 87. Therapist Alexandria Minkler testified that she worked with J.F. on "processing her trauma." *Id.* at 92. Therapist Minkler

said that J.F. needs a home where "she can establish safety, have support, and have structure," because "support helps with her safety, the feeling of safety," "where she can come out of feeling as though she has to fend for herself emotionally and physically." *Id.* at 93-94.

[26] Therapist Janet Shull testified that she worked with Mother. Regarding Parents' relationship, Therapist Shull said that Mother "had a long relationship with [Father]. He's the father of her children. They've had a close relationship for years. She cares about him and for him. She believes that he has potential also. She wants him to have influence in the lives of her children." Tr. Vol. III p. 120. Therapist Shull explained that Mother "thinks she will save [Father]." Therapist Shull stated that she was aware that Mother used methamphetamine in September 2019 and thought that Mother did so because she was lonely. Mother admitted that she used methamphetamine over Labor Day weekend. *See id.* at 148. Mother explained that she did it because she "just wanted to be numb." *Id.* at 149. Father testified that "at whatever cost to [him]," Mother's parental rights should not be terminated. *Id.* at 173. When asked what he meant by that, Father responded, "I am more than suggesting that I would do whatever it takes to make sure that happens for their peace." *Id.*

[27] FCM Eiler testified that DCS had been providing the family services for "over six years . . . And every time [Children] go back home, something happens between [Mother] and [Father] that results in DCS having to re-remove [Children] again." Tr. Vol. II p. 153. FCM Eiler said that Children "deserve stability, they deserve permanency, and they haven't had that. . . . Most of their

childhood has been lived in foster care." *Id.* FCM Eiler stated that adoption was DCS's plan and that she believed termination of Parents' parental rights is in Children's best interests. *Id.* FCM Gary Spratt also testified that Parents were "given plenty of time, plenty of opportunities, nearly every service at [DCS's] disposal. But every time we get close, we come right back to the same issues that got [DCS] involved in the first place." Tr. Vol. III p. 16. FCM Spratt said that he thought that termination of Parents' parental rights is in Children's best interests. *See id.* at 17. CASA Robert Cole testified that "it's been over six years and there's been very little substantial progress." *Id.* at 54. CASA Cole said that Mother has "admitted to having taken methamphetamine and . . . her reason for doing it is she just didn't want to feel pain anymore . . . it seems that she just falls back on her old habits." *Id.* at 56-57. CASA Cole supported DCS's plan for adoption and believed that termination of Parents' parental rights is in Children's best interests. *See id.* at 53-54. In November 2019, the trial court issued its order terminating Parents' rights to Children.

[28]     Father and Mother separately appeal.

# Discussion and Decision

[29]     Parents make two separate arguments on appeal. Father argues that the trial court abused its discretion by denying his motion for change of judge and motions to continue. Mother argues that there is insufficient evidence to support the trial court's termination order.

# I. Father's Appeal

Father contends that the trial court abused its discretion in two ways: (1) by denying his motion for a change of judge and (2) by denying his motions to continue.

# A. Motion for Change of Judge

First, Father argues that "[t]he trial court was not the neutral and detached magistrate required by due process to afford [Father] a fair hearing, and should have granted his Motion for Change of Judge. It was an abuse of discretion for the court not to do so." Father's Br. p. 15. A ruling upon a motion for a change of judge rests within the sound discretion of the trial judge and will be reversed only upon a showing of an abuse of that discretion. *Carter v. Knox Cty. Office of Family & Children,* 761 N.E.2d 431, 434 (Ind. Ct. App. 2001). Reversal is appropriate only where a record discloses actual bias and prejudice against a party. *Id.*

The law presumes that a judge is unbiased and unprejudiced. *Carter*, 761 N.E.2d at 435. To overcome this presumption, the moving party must establish that the judge has personal prejudice for or against a party. *Id.* Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before him. *Id.* Adverse rulings and findings by the trial judge do not constitute bias per se. *Id.* Instead, prejudice must be shown by the judge's trial conduct; it cannot be inferred from his subjective views. *Id.* Moreover, Indiana courts credit judges with the ability

to remain objective notwithstanding their having been exposed to information which might tend to prejudice lay persons. *Id*. Thus, the mere fact that a party has appeared before a certain judge in a prior action or the judge has gained knowledge of the party by participating in other actions does not establish the existence of bias or prejudice. *Id*. Indeed, our courts have recognized that in the area of termination proceedings, a judge is very likely to have knowledge of previous proceedings because the juvenile court's jurisdiction over a child in need of services or their parent continues until the child reaches their twenty-first birthday, unless the court discharges the child or their parent at an earlier time. *Id*.

[33]    Father says that the following remarks made by the trial court at the October 25 hearing show bias:

- When referring to the prior termination proceeding, the court commented, "in that proceeding, I did deny termination. I indicated that I'd have no problem terminating your parental rights based upon the evidence and history, um, and your apparent acquiescence to that. But I did not, because I decided based upon the evidence presented at that time, not to terminate Mom's rights."

- When discussing Father's request for a second chair, the court noted, "given my prior position not to terminate your rights, if I don't terminate [Mother's] rights, you're adequately represented by [Mother's attorney], who is not your attorney of record. But the issues she will preserve and raise would benefit you as well."

- After denying Father's motions to continue, when confirming that the termination hearing would resume as scheduled, the court said, "these children deserve the attention and the life they ar[e] entitled to. They've certainly not been getting it in the last several years. You've actually played zero role."

Tr. Vol. II pp. 30-31, 34.[4]

[34] At the outset, we note that Father knew that the same judge who heard the first termination proceeding would be presiding over this one long before he filed his motion for change of judge. In fact, at the June 28 hearing, where Father was present, he joined Mother's motion for change of judge. The fact that he knew that the judge would be the same for this length of time supports the trial court's conclusion that Father's motions, made on the eve of trial, were a "sham" to give Mother more time. Father's App. Vol. II p. 45. Moreover, Father does not establish how the above comments show that the trial court had a personal prejudice against him. Instead, the above comments show that the trial court was making an observation about the prior termination proceeding and Father's participation in the current proceedings, not prejudging any future termination. As discussed above, the mere fact that a judge has gained knowledge of the party by participating in other actions does not establish the existence of bias or

---

[4] Indiana Appellate Rule 46 provides that every contention in the argument section of a brief "must be supported by citations to . . . the Appendix or parts of the Record on Appeal relied on[.]" The argument section of Father's brief does not include a single citation to the record. Needless to say, this lack of citations substantially hindered our review.

prejudice. *See Carter*, 761 N.E.2d at 435. Accordingly, the trial court did not abuse its discretion in denying Father's last-minute motion for a change of judge.

# B. Motions to Continue

[35] Father also argues that the trial court abused its discretion when it denied his motions to continue. Generally, the decision to grant or deny a motion to continue is within the sound discretion of the trial court, and we will reverse only for an abuse of discretion. *In re J.E.*, 45 N.E.3d 1243, 1246 (Ind. Ct. App. 2015), *trans. denied*. An abuse of discretion occurs when the trial court's conclusion is clearly against the logic and effect of the facts and circumstances before the court or the reasonable and probable deductions to be drawn therefrom. *Id*. When a motion to continue has been denied, an abuse of discretion will be found if the moving party has demonstrated good cause for granting the motion, but we will reverse the trial court's decision only if the moving party can show that he was prejudiced by the denial. *Id*.

[36] Here, the record shows that Father fired his longtime attorney and filed three motions to continue less than two weeks before the termination hearing was to resume. The trial court did not believe "for one second" that Father needed a continuance and instead thought that his motions to continue and slew of other motions were a "sham," designed to delay the proceedings and give Mother more time to work toward reunification. Father's App. Vol. II pp. 45-46. Indeed, Father admitted during trial that he would "do whatever it takes" to

ensure Mother's parental rights to Children were not terminated. Tr. Vol. III p. 173. The trial court did not believe that Father required a continuance and therefore denied his motion. We do not second-guess the trial court's credibility determination on appeal. As such, we conclude that the trial court did not abuse its discretion.

[37] To the extent that Father argues that his due-process rights were violated because "his right to have counsel represent his interests was significantly impaired," Father's Br. p. 23, we find no merit to this argument. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). Due process in termination cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting use of the challenged procedure. *Id*. There is no doubt that Father's private interest in his parental relationship with Children is substantial. *See id.* Likewise, the government's countervailing interest in protecting the welfare of Children is also substantial. *See id.* As for the risk of error, the record shows that Father, with the assistance of an attorney, was able to testify, cross-examine DCS's witnesses, and call his own witnesses. And our review of the record shows that Father's "second chair" adequately represented his interests. To the extent that Father complains that his "second chair" was under prepared, that was due to his own dilatory tactics. First, Father was very clear that he wanted to represent

himself and was only seeking a "second chair" to assist him. Next, Father's request for a "second chair" was part of a last-minute slew of motions made just before the termination hearing was scheduled to resume. Finally, the trial court found that Father's many motions were a "sham" designed to delay the proceedings to give Mother more time to work toward reunification. For all of these reasons, we do not think that the trial court's denial of Father's motions to continue created a substantial risk of error.[5]

# II. Mother's Appeal

[38] Mother contends that there is insufficient evidence to support the trial court's termination order.[6]  When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous,

---

[5] To the extent that Father argues that "resetting the hearing within thirty days would have allowed for preparation by counsel, in light of the late submission of discovery," we find no merit to this argument. Father's Br. p. 23. Father made it clear that he was going to represent himself and concedes that he received the State's discovery "in open court," "no more than ten days" before the termination hearing. *Id.* at 22. Accordingly, any claim that he now makes that his "second chair" did not have time to review the State's discovery was because of his own doing.

[6] Father does not challenge the sufficiency of the evidence supporting the trial court's termination order.

we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

Mother first challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Children's removal will not be

remedied. In determining whether there is a reasonable probability that the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of her future behavior. *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016).

[41] Here, even after six years, Mother failed to demonstrate that she was any closer to providing Children a safe, stable home than she was at the beginning of the CHINS case in July 2013. The trial court's unchallenged findings on this issue support its conclusion that there is a reasonable probability that the conditions resulting in Children's removal will not be remedied. *See, e.g.*, *In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014) (findings regarding father's non-compliance with services supported trial court's conclusion that conditions resulting in children's removal from father's care would not be remedied). That is, the trial court found:

> The children have been removed from their parents since July 20, 2013, which is over six (6) years. [Mother] has changed her

residence at least six (6) times. [Father] has changed his residence at least five (5) times. [Father] has been in and out of jail numerous times and was "on the lam" in Georgia before being arrested and extradited back to Indiana earlier this year. For both [Mother] and [Father], drug use and alcohol abuse continue. The children's exposure to their parent[s'] bizarre behaviors continue. The events that occurred on and immediately before February 15, 2019, were the last straw. As a result of those events, [D.F.] and [J.F.] were, again, removed. [S.F.] was still in foster care. Even after that, [Mother] ingested methamphetamine in September of this year.

Father's App. Vol. II p. 40. Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied.[7]

[42] Mother also challenges the trial court's conclusion that termination is in Children's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating the

---

[7] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Children's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the trial court to find that only one of the two requirements of subsection (B) has been established by clear and convincing evidence), *trans. denied*.

parent-child relationship. *Id*. Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*. at 1158-59.

[43] Here, FCMs Eiler and Spratt as well as CASA Cole all testified that termination of Parents' parental rights is in Children's best interests. *See* Tr. Vol. II p. 153; *see also* Tr. Vol. III pp. 17, 53-54. Furthermore, all of Children's therapists expressed that the child they worked with suffered trauma and needed permanency. *See* Tr. Vol. II pp. 63, 81, 93-94; *see also In re A.D.S.*, 987 N.E.2d at 1159 ("permanency is a central consideration in determining the best interests of a child"). The trial court found that Children "need to be in safe and secure surroundings. History show [Parents] cannot and will not provide that. None of the services [Mother] has engaged in will change that." Father's App. Vol. II p. 45; *see also In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships"). As such, the trial court did not err by finding that termination is in Children's best interests.

[44] Finally, Mother argues that the trial court erred in concluding that there is a satisfactory plan for Children's care and treatment. In order for the trial court to terminate a parent-child relationship, it must find that there is a satisfactory plan for the care and treatment of the child. *See* Ind. Code § 31-35-2-4(b)(2)(D). Such a plan need not be detailed, so long as it offers a general sense of the

direction the child will go after the parent-child relationship is terminated. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007), *trans. denied*. Adoption is generally a satisfactory plan, even when a potential adoptive family has not been identified. *See id*. at 375. Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to decide whether an adoptive placement is appropriate. *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*.

[45] Here, DCS's plan is adoption. FCM Eiler agreed with this plan. Mother contends that adoption is not a satisfactory plan. Instead, she argues that "maintaining the status quo, i.e. the Children remaining in foster placement while Mother completes additional services is a very satisfactory plan." Mother's Br. p. 35. The trial court found that Mother was provided services for over six years but failed to benefit from them and that Children "should suffer no more." Father's App. Vol. II p. 45; *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them). Therefore, the trial court did not err in concluding that adoption is a satisfactory plan for Children.

[46] Affirmed.

May, J., and Robb, J., concur.